**Opinion filed August 8, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00226-CR

_____

## VICTOR MANUEL ACOSTA, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 39th District Court**

**Haskell County, Texas**

**Trial Court Cause No. 6432**

## M E M O R A N D U M   O P I N I O N

The jury found Victor Manuel Acosta guilty of money laundering and assessed his punishment at confinement for eight years in the Institutional Division of the Texas Department of Criminal Justice. *See* TEX. PENAL CODE ANN. § 34.02 (West 2011). In a single issue, Appellant argues that the evidence was insufficient to support the verdict. We affirm.

On July 9, 2010, at 10:00 p.m., Trooper Brody Moore with the Texas Department of Public Safety (DPS) stopped a tractor-trailer truck in Haskell County because the truck had a defective clearance light. The truck was traveling southbound on Highway 277 and stopped on the upward grade of the Highway 380 overpass. Trooper Moore was concerned about the unusual place that the trucker stopped; he knew that the truck was registered for 80,000 pounds and was concerned that it might roll back into his patrol car.

When Trooper Moore approached the driver's side, he noticed that Appellant appeared wide-eyed and his lip quivered slightly. There was a passenger in the sleeping berth of the truck, and Trooper Moore noticed that there were five cell phones in the truck. Appellant said that the passenger wanted to be a truck driver but had no driver's license, only a Texas I.D. card. Appellant gave the passenger's name as "Gus," but he did not recall the passenger's last name. Trooper Moore later learned that the passenger's name was Gustavo Dominguez.

Based on his specialized training and experience in drug and drug-money interdiction, Trooper Moore recognized a pattern that had occurred in other money seizures: a passenger with no driver's license traveling with the truck driver. Trooper Moore also pointed out that it was not normal for there to be five cell phones between one driver and an unemployed passenger.

The fact that the truck logbooks were not up-to-date was another factor noticed by Trooper Moore. The logbook reflected that Appellant left Kankakee, Illinois, at 2:00 p.m. on July 8 to go to Markham. Trooper Moore stopped the truck on July 9 at 10:00 p.m.; the last entry in the logbook was at 4:00 a.m. in Missouri. Truckers are required to update the logbook when they stop for fuel, for rest, and for other changes in their status. Trooper Moore observed that Appellant had driven a longer distance than one driver should drive in one sitting under the

2

trucking regulations. Trooper Moore explained that drivers often do that when they are trying to avoid detection.

Trooper Moore stated that he has a routine in questioning a driver when there are suspicious circumstances. He first asks the driver if he has anything illegal in the truck. He then asks separately if the driver has any guns, any marihuana, any cocaine, any methamphetamine, or any heroin. He finally asks, "Do you have any large sums of cash?" When Trooper Moore asked that question, Appellant responded, "No," but broke eye contact. Appellant had maintained eye contact when asked all the other questions.

At that point, Trooper Moore asked Appellant for consent to search the truck, and he consented. Deputy Winston Stephens arrived, and he and Trooper Moore began searching the truck. Trooper Moore began by looking at the speakers that are above the second bunk. In a Freightliner truck, there is a huge cavity behind the speakers that runs across the entire back wall. The cavity is about eight and one-half feet long, two feet high, and a foot deep. Trooper Moore explained that, when you shine a light into the speakers, you can see around the mesh; however, this time his light reflected back at him, and that was unusual.

Realizing that there was something in the cavity, he noticed that the screws on the right speaker were heavily tooled as if the speaker mesh had been taken off and put back on. Also, the speaker mesh was missing a screw. Trooper Moore found a star-headed screwdriver in the toolbox behind the passenger's seat that he used to remove the screws. When he removed the speaker mesh, he saw that there was a cardboard cutout covering the mesh to prevent someone from seeing in. Trooper Moore then saw bundles of currency. After finding the currency, the officers arrested Appellant and Dominguez.

Deputy Stephens also had specialized training and experience in drug interdiction. When the officers (with guns drawn) told Appellant and Dominguez

3

that they were under arrest for money laundering, Deputy Stephens said that Trooper Moore asked Appellant, "How much money is in the truck?" Appellant responded, "I don't know." There was no excitement in Appellant's voice, and he was pretty nonchalant.

Trooper Moore testified that there were individual vacuum-sealed bundles of currency spread across the whole cavity behind the speakers. He explained that individuals in the drug trade put currency in smaller vacuum-sealed bundles for ease of concealment and for avoiding detection by a drug dog. The money was counted at Haskell National Bank; the bundles contained $502,020 in currency.

Trooper Moore testified that he has made four significant seizures of drugs; three of the loads originated in El Paso. He has made five money seizures; four of them were in vehicles bound for the El Paso area. He explained that a significant amount of the drugs seized originate in Mexico and that $502,020 would be a felony amount for any drug.

Sergeant Kyle Taylor has been employed with the DPS for eight years and is a K-9 handler. His dog, a yellow lab, has passed all the certifications and has been trained to alert on marihuana, heroin, cocaine, and methamphetamine. Sergeant Taylor placed bundles of the currency in two new duffel-type bags, and Sergeant Tullos provided four bags that had not been around narcotics. Trooper Taylor made two lines of three bags each with one of the bags in each line containing some of the currency. The bags with currency were randomly placed in the lines. The dog alerted on the two bags containing currency.

David Orlando Ramirez is a special agent for the Office of Investigations in the Department of Homeland Security. He was involved in the investigation of the $502,020. Agent Ramirez testified that Dominguez had first called him and then written him seeking the return "of his money." Agent Ramirez said that the seizure specialists in Dallas told him that they had sent letters to Dominguez but that he

4

had not responded. Agent Ramirez ultimately learned that the money was forfeited on December 23, 2010.

Agent Josh Burson with DPS testified that he took the currency from the bank to the Abilene Police Department's forensics lab. The lab personnel were unsuccessful in their attempt to lift fingerprints from the plastic packages. He explained that it was usually impossible to lift fingerprints from plastic packages of that type.

Agent Anthony Bennett, with the Criminal Investigation Division (CID) of the DPS, has been involved in drug investigations for over seven years. After Agent Bennett gave the Miranda warnings, Appellant said that he had been employed with Texas Southwest Transport in El Paso for about a year. Although Appellant had known "Gus" for eight years, he did not know "Gus's" last name. Appellant told Agent Bennett that he had been in possession of the truck for approximately five months, that he was the one responsible for the truck, and that he was the only one who had a set of keys to the truck.

Sheriff David Halliburton of Haskell County testified that he was serving as bailiff in April 2011 when both Appellant and Dominguez were involved in court proceedings. Dominguez was in custody at the time. At the request of Dominguez's attorney, Sheriff Halliburton allowed Dominguez and Appellant to visit. Watching them through the door, Sheriff Halliburton could not hear what was said, but it did not appear that either man was agitated or angry. It appeared to be an amicable conversation that lasted about ten or fifteen minutes.

*Standard of Review*

In his sole issue, Appellant challenges the sufficiency of the evidence to support his conviction. We review a sufficiency challenge under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89

5

(Tex. App.—Eastland 2010, pet. ref'd).  Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Under the above standard, all evidence, including circumstantial evidence, is considered.  *Nguyen v. State*, 54 S.W.3d 49, 52 (Tex. App.—Texarkana 2001, pet. ref'd).  Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence can be sufficient to establish guilt.  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  The standard of review is the same for both direct and circumstantial evidence.  *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

*Analysis*

A person commits the offense of money laundering if he knowingly acquires or maintains an interest in, conceals, possesses, transfers, or transports the proceeds of criminal activity.  PENAL § 34.02(a)(1).  Knowledge of the specific nature of the criminal activity giving rise to the proceeds is not required to establish a culpable mental state under Section 34.02.  *Id.* § 34.02(a-1).

Appellant correctly states that the sufficiency of the evidence is measured against the elements of a hypothetically correct jury charge.  *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  Such a charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

The indictment alleged that Appellant "did then and there knowingly conceal the proceeds of criminal activity, to-wit: delivery of a controlled substance, and the value of said funds was $200,000.00 or more." Appellant argues that the evidence was insufficient to show that he knew or had knowledge that $502,020 was concealed in the hidden compartment behind the speakers in the cab of the truck. He also argues that the evidence was insufficient to show that the currency constituted proceeds from the delivery of a controlled substance; however, in final argument to the jury, he acknowledged that it was a reasonable probability that the currency was from the delivery of drugs.

Appellant's defense was that he was a "blind mule" and that Dominguez was the one guilty of money laundering. Trooper Moore acknowledged that he was aware of the term and its meaning: a "blind mule" is an innocent person duped by the drug cartels to transfer contraband without knowledge that he is carrying contraband. Appellant argued to the jury that the evidence only showed that "Gustavo Dominguez" was the person guilty of money laundering: Dominguez was unemployed, was traveling across the country without a commercial driver's license, and was found guilty and sentenced to ten years in prison. Dominguez was the one who wrote a letter to Homeland Security seeking "his" money back. Appellant points out that he made no admissions of guilt, that he denied knowledge of the money when questioned by the officers, that he was gainfully employed, that he had no criminal history, that he had fully cooperated with the officers, that he gave consent to search, and that he hauled a lawful load to Illinois and was returning to El Paso.

Proof of a culpable mental state generally relies on circumstantial evidence. In this case, proof of "knowledge" was an inference drawn by the jury from all of the circumstances. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978).

7

In the typical case, to establish unlawful possession, the State must prove two elements: (1) that the accused exercised care, control, and management over the item and (2) that the accused knew the illegal nature of the possessed item. *See Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006) (involving possession of a controlled substance). The evidence is sufficient if it shows that the defendant possessed the item either exclusively or jointly with another. *See Evans*, 202 S.W.3d at 162; *Martin v. State*, 753 S.W.2d 384, 387 (Tex. Crim. App. 1988); *Dubry v. State*, 582 S.W.2d 841 (Tex. Crim. App. 1979). When the accused is not in exclusive possession of the place where the contraband is found, then additional independent facts and circumstances must link the accused to the substance in such a way that it can be reasonably concluded that the accused possessed the contraband and had knowledge of it. *See Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005).

The essential elements of the offense of money laundering, pursuant to Section 34.02(a)(1) of the Texas Penal Code, are that a person: (1) knowingly; (2) acquires or maintains an interest in, receives, conceals, possesses, transfers, or transports; (3) the proceeds; (4) of criminal activity. *See Deschenes v. State*, 253 S.W.3d 374, 380 (Tex. App.—Amarillo 2008, pet. ref'd). Here the indictment specifically alleged that the criminal activity was the delivery of drugs.

Appellant told Agent Bennett that he had been in possession of the truck for approximately five months, that he was the one responsible for the truck, and that he was the only one who had a set of keys to the truck. By his own admission, appellant exercised exclusive care, custody, control, or management over the currency hidden behind the speakers in the cab of the truck. Knowledge can be inferred from the defendant's control of the vehicle in which drugs or illegal items are found, especially when the amount of the contraband is large enough to indicate that the accused knew of its presence. *Bethancourt-Rosales v. State*, 50

8

S.W.3d 650, 654 (Tex. App.—Waco 2001, pet. ref'd); *see Villegas v. State*, 871 S.W.2d 894, 896–97 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

In addition to Appellant having sole control of the truck, there are other factors or affirmative links from which the jury could have reasonably concluded that Appellant knew or had knowledge that $502,020 was concealed in the hidden compartment behind the speakers in the truck's cab. The amount of currency was extremely large, and it was found in separate vacuum-packed bundles for ease of concealment and to prevent detection by dog searches. *See United States v. $242,484.00*, 389 F.3d 1149, 1162 (11th Cir. 2004); *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 502 (8th Cir. 2004). It would have been extremely difficult for Dominguez to have hidden the currency without Appellant knowing that he hid it. The star-headed screwdriver that fit the screws in the speaker mesh was found in the truck's toolbox. The screws on the right speaker were heavily tooled as if they had been taken out and put back in, and one screw was missing.

Appellant maintained eye contact when Trooper Moore asked him about having anything illegal in the truck and separately asked him about various drugs. Yet when Trooper Moore asked Appellant whether Appellant had large sums of cash, Appellant broke eye contact. Subsequently, after finding the currency and placing Appellant under arrest, Trooper Moore asked Appellant, "How much money is in the truck?" Appellant responded, "I don't know." There was no excitement in Appellant's voice; he was pretty nonchalant.

Appellant told Agent Bennett that he had known "Gus" for about eight years but that he did not know "Gus's" last name. Dominguez did not have a driver's license and, according to Appellant, was riding with Appellant to learn to be a truck driver. Trooper Moore testified that it was unusual for there to be five cell phones with a truck driver and a passenger who was not a truck driver. Appellant

identified two of the cell phones to be his, and Dominguez identified two to be his. Neither man claimed the fifth cell phone.

The logbook revealed another suspicious circumstance. The logbook reflected that Appellant left Kankakee, Illinois, at 2:00 p.m. on July 8 to go to Markham. The last entry in the logbook was at 4:00 a.m. in Missouri on July 9. Trooper Moore stopped Appellant on July 9 at 10:00 p.m. Appellant had driven a much longer distance than one driver should drive in one sitting under the trucking regulations. Trooper Moore, based on his experience in drug interdiction, explained that drivers often do that when they are trying to avoid detection.

There was also legally sufficient evidence that the currency represented proceeds from the delivery of drugs. The large amount of currency was in vacuum-packed bundles to avoid detection by a drug dog. Sergeant Taylor placed bundles of the currency in two new duffel-type bags and then randomly placed those bags in two lines with other bags that had not been around narcotics. Sergeant Taylor's yellow lab alerted on the two bags with the currency, indicating that the currency had been involved with drugs. Trooper Moore testified that a significant amount of drugs originate in Mexico, that he had made three significant seizures of drugs in loads coming from El Paso, that he had seized money in trucks headed to El Paso, and that $502,020 would be a felony amount for drugs such as marihuana, cocaine, methamphetamine, or heroin.

Finally, there was the conversation between Appellant and Dominguez that Sheriff Halliburton observed while he was serving as bailiff. Although Sheriff Halliburton did not hear what was said, the conversation appeared to be amicable, and neither man was agitated or angry. If Appellant had not known about the hidden currency, Appellant probably would have been angry at Dominguez for hiding the currency in his truck without Appellant's knowledge.

Appellant relies on *Deschenes v. State*, but the facts in *Deschenes* were different from those in this case. The Amarillo Court of Appeals first held that the indictment was defective because it did not specify the criminal activity from which the $17,620 in proceeds was derived; however, Deschenes failed to compel the State to specify the specific criminal activity. *Deschenes*, 253 S.W.3d at 380. Although the State arguably had a lesser burden in *Deschenes* than here, the State failed to provide legally sufficient evidence of the nexus between the money and a particular criminal activity. The *Deschenes c*ourt pointed out that "the money was not packaged in any way to indicate a conscious desire to prevent its detection by drug dogs," nor was the money concealed in a compartment within the car. The court also noted that the dog had alerted on pieces of luggage but that there was no evidence "that the currency alone was removed from the luggage and alerted to in a controlled area or ever tested for the presence of drug residue." *Deschenes*, 253 S.W.3d at 385.

Here the indictment alleged that the criminal activity was the delivery of a controlled substance. As opposed to *Deschenes*, the State explained to the jury the elements of money laundering and then carefully reminded the jury of the evidence that supported each element. We are aware that, whether direct or circumstantial, the evidence "must establish, to the requisite level of confidence, that the accused's connection with the [contraband] was more than just fortuitous." *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995). Viewing all the evidence together, we find that the evidence was legally sufficient to support Appellant's conviction. We overrule Appellant's sole issue.

*This Court's Ruling*

We affirm the judgment of the trial court.

TERRY McCALL

JUSTICE

August 8, 2013

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.